FILED

2019 NOV 20 PM 3:56

CLERK, US DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**JOHN L. BURTON** n/k/a Jamaal Ali Bilal, a/k/a "Superman," and all others similarly situated,

CASE NO. 8:19 cv 2869 T35JSS

    Plaintiffs,

v.

**FRANK SARIVOLA, EQUAL OPPORTUNITY TECHNICIAN, PINELLAS COUNTY HUMAN RIGHTS OFFICE; Melissa LNU MADISON POINT HOUSING INTAKE SPECIALIST; JANE DOE CRIMINAL BACKGROUND SCREENING SPECIALST; PINELLAS COUNTY; and VA MEDICAL CENTER, BAY PINES Florida et.al**

    Defendants
_____/

## PLAINTIFF'S HOUSING DISCRIMINATION COMPLAINT UNDERTHE FAIR HOUSING ACT 42 U.S.C.§ 3601 OF TILE VIII AND 42 U.S.C §1983

### I. Introduction

1.    The fair Housing act prohibits discrimination in the sale, rental or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex disability familial status, national origin and, veteran status.[1]

---

[1] 42 U.SC.§3601 et seq. It should be noted that in the attachments to this complaint there are a Pinellas County Human Rights Commission Complaint which portends to be conducting an investigation into Madison Point issues. It should also be noted that the Human Rights Commission Complaint is not alleging claims against remote criminal background checks as a basis for evictions and/or housing placement denials.



2. HUD's Office of General Counsel issues this guidance concerning how the Fair Housing Act applies to the use of criminal history by providers or operators of housing and real-estate related transactions.

3. Specifically, this guidance addresses how the discriminatory effects and disparate treatment methods of proof apply in Fair Housing Act cases in which a housing provider justifies an adverse housing action – such as a refusal to rent or renew a lease – based on an individual's criminal history.

## II. Background

4. As many as 100 million U.S. adults – or nearly one-third of the population – have a criminal record of some sort.[2]

5. The United States prison population of 2.2 million adults is by far the largest in the world.[3]

6. As of 2012, the United States accounted for only about five percent of the world's population, yet almost one quarter of the world's prisoners were held in American prisons.[4]

---

[2] Bureau of Justice Statistics, U.S. Dep't of Justice, *Survey of State Criminal History Information Systems, 2012*, 3 (Jan. 2014), *available at* https://www.ncjrs.gov/pdffiles1/bjs/grants/244563.pdf.
[3] Nat'l Acad. Sci., Nat'l Res. Couns., *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 2 (Jeremy Travis, et al. eds., 2014), *available at:* http://www.nap.edu/catalog/18613/the-growth-of-incarceration-in-the-united-states-exploring-causes.
[4] *Id.*

7. Since 2004, an average of over 650,000 individuals have been released annually from federal and state prisons,[5] and over 95 percent of current inmates will be released at some point.[6]

8. When individuals are released from prisons and jails, their ability to access safe, secure and affordable housing is critical to their successful reentry to society.[7]

9. Yet many formerly incarcerated individuals, as well as individuals who were convicted but not incarcerated, encounter significant barriers to securing housing, including public and other federally-subsidized housing because of their criminal history.

10. In some cases, even individuals who were arrested but not convicted face difficulty in securing housing based on their prior arrest.

11. Across the United States, African Americans and Hispanics are arrested, convicted and incarcerated at rates disproportionate to their share of the general population.[8]

---

[5] Nat'l Acad. Sci., Nat'l Res. Couns., *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 2 (Jeremy Travis, et al. eds., 2014), *available at:* http://www.nap.edu/catalog/18613/the-growth-of-incarceration-in-the-united-states-exploring-causes.

[6] Bureau of Justice Statistics, U.S. Dep't of Justice, *Reentry Trends in the United States, available at* http://www.bjs.gov/content/pub/pdf/reentry.pdf.

[7] *See, e.g.*, S. Metraux, et al. "Incarceration and Homelessness," in *Toward Understanding Homelessness: The 2007 National Symposium on Homelessness Research*, #9 (D. Dennis, et al. eds., 2007), *available at:* https://www.huduser.gov/portal//publications/pdf/p9.pdf (explaining "how the increasing numbers of people leaving carceral institutions face an increased risk for homelessness and, conversely, how persons experiencing homelessness are vulnerable to incarceration.").

[8] *See infra* nn. 16-20 and accompanying text.

12. Consequently, criminal records-based barriers to housing are likely to have a disproportionate impact on minority home seekers.

13. While having a criminal record is not a protected characteristic under the Fair Housing Act, criminal history-based restrictions on housing opportunities violate the Act if, without justification, their burden falls more often on renters or other housing market participants of one race or national origin over another (i.e., discriminatory effects liability).[9]

14. Additionally, intentional discrimination in violation of the Act occurs if a housing provider treats individuals with comparable criminal history differently because of their race, national origin or other protected characteristic (i.e., disparate treatment liability).

### III. FACTS PARTICIUALR TO PLAINTIFF JOHN L. BURTON

15. Plaintiff John L. Burton is a twice Honorable Discharged Vietnam Navy veteran.[10]

16. Mr. Burton is an Afro-American.

17. He is also homeless.

---

[9] The Fair Housing Act prohibits discrimination based on race, color, religion, sex, disability, familial status, and national origin. This memorandum focuses on race and national origin discrimination, although criminal history policies may result in discrimination against other protected classes.

[10] Mr. Burton was attached to Squadron VA-87 (now VFA-87) commonly known as the "War Party" the #1 attack squadron in our world

18. Because of his homelessness, Mr. Burton applied for homeless housing at the VA Medical Center Bay Pines, FL under what is commonly termed the HUD/VASH Program.[11]

19. He was given a HUD/VASH housing voucher which encompasses the territorial jurisdiction of Pinellas County, Florida.

20. Mr. Burton, along with personal friend Anthony McElhaney (also a Navy veteran), traveled to Madison Point Apartments located on 380 Martin Luther King Ave. in Clearwater, Florida apply for housing.[12]

21. It was there where we were processed in by Madison Point official Mellissa.

22. Melissa was aware that Plaintiff Burton had a VA HUD/VASH voucher and had earlier called him several times the past two months to see if Mr. Burton was interested in the apartment complex which she said was set to open in August 2019 after they were completely built and that she was offering plaintiff Burton the very last apartment she had left to rent.

23. In other words, when my friend and I arrived to view those apartments we were unable to tour them because construction was not yet complete.

---

[11] **HUD-VASH** provides permanent supportive housing for eligible **homeless Veterans** who are single or eligible **homeless Veterans** with families. The **program** is developed for the **homeless Veteran**, so eligible **Veteran** families must include the **Veteran**. See https://www.va.gov/homeless/hud-vash_eligibility.asp

[12] Mr. McElhaney is also an Afro-American who was denied housing at Madison Point because Melissa lied and told him there were no more apartments available when in fact Madison Point wasn't even yet opened.

24. However, Melissa went ahead and processed Mr. Burton's housing application including accepting a $350 application fee.

25. She also induced Mr. Burton to reduce his patient work stipend hours at the VA, where he was being paid minimum wages for 24 hours' worth a work because Melissa stated that by working 24 hours Mr. Burton made too much monies in salary to be considered for the HUD/VASH program and that in order for me to qualify I would have to reduce my workload to 11 hours which I did with my VA Supervisors the following day.[13]

26. On August 15, 2019, the date Madison Point was set to open, Mr. Burton received a phone call from a female Madison Point "screening official" who informed him that his application to live at Madison Point was denied due to his criminal background.

27. Mr. Burton does in fact have a criminal background but the bulk of those convictions occurred approximately 40 years or more ago and each one of those convictions was overturned on direct appeal prior to the time served pleas he later made on those convictions. See *Burton v. State*, 442 So 2d 355 (Fla. 1st DCA 1983); *Burton v. State*, 596 So 2d 1184 (Fla. 1st DCA 1992); *Burton v. State*, 651 So

---

[13] Mr. Burton attempted to explain to Melissa that the VA CWT Program was a non-taxable work program for veterans and as such, those monies were exempt for taxation purposes under the HUD/VASH Program. She still counted it as income, which caused Plaintiff Burton to lose thousands of dollars in potential wages earned in the CWT Program..

2d 793 (Fla. 1st DCA 1995); *Bilal v. Moore*, 3:98 cv 179 (U.S. Dist. Ct. Pensacola Division) (grant of conditional writ of habeas corpus).

28. State and federal law in most states prohibit housing landlords from using crimes more than seven years old in housing decisions.[14]

29. According to the National Coalition for Homeless Veterans 1out of 3 veterans incarcerated in jails and prisons in America are there for a sex offense.[15]

30. However, under the HUD/VASH Program, sex offenders with lifetime registration requirements, are ineligible for HUD/VASH.

31. In other words, the most vulnerable of our HOMELESS VETS are equal protectionally denied housing by a Veteran Program supposedly designed to give veterans housing.

### IV. Discriminatory Effects Liability and Use of Criminal History to Make Housing Decisions

---

[14] *Cf. El*, 479 F.3d at 247 (noting that plaintiff's Title VII disparate impact claim might have survived summary judgment had plaintiff presented evidence that "there is a time at which a former criminal is no longer any more likely to recidivate than the average person...."); *see also Green*, 523 F.2d at 1298 (permanent exclusion from employment based on any and all offenses violated Title VII); *see* Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 Criminology and Pub. Pol'y 483 (2006) (reporting that after six or seven years without reoffending, the risk of new offenses by persons with a prior criminal history begins to approximate the risk of new offenses among persons with no criminal record).

[15] See National Coalition of Homeless Vets - Military Connection
https://militaryconnection.com/veterans/veterans-7
(About 35% of veterans in State prison, compared to 20% of non-veterans, were convicted of homicide or sexual assault)

32. A housing provider violates the Fair Housing Act when the provider's policy or practice has an unjustified discriminatory effect, even when the provider had no intent to discriminate.[16]

33. Under this standard, a facially-neutral policy or practice that has a discriminatory effect violates the Act if it is not supported by a legally sufficient justification.

34. Thus, where a policy or practice that restricts access to housing on the basis of criminal history has a disparate impact on individuals of a particular race, national origin, or other protected class, such policy or practice is unlawful under the Fair Housing Act if it is not necessary to serve a substantial, legitimate, nondiscriminatory interest of the housing provider, or if such interest could be served by another practice that has a less discriminatory effect.[17]

35. Discriminatory effects liability is assessed under a three-step burden-shifting standard requiring a fact-specific analysis.[18]

V. **THE DISPARATIVE IMPACT STANDARD: Evaluating Whether the Criminal History Policy or Practice Has a Discriminatory Effect**

---

[16] 24 C.F.R. § 100.500; *accord Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, ___ U.S. ___, 135 S. Ct. 2507 (2015).

[17] 24 C.F.R. § 100.500; *see also Inclusive Cmtys. Project*, 135 S. Ct. at 2514-15 (summarizing HUD's Discriminatory Effects Standard in 24 C.F.R. § 100.500); *id.* at 2523 (explaining that housing providers may maintain a policy that causes a disparate impact "if they can prove [the policy] is necessary to achieve a valid interest.").

[18] *See* 24 C.F.R. § 100.500.

36. In the first step of the analysis, a plaintiff (or HUD in an administrative adjudication) must prove that the criminal history policy has a discriminatory effect, that is, that the policy results in a disparate impact on a group of persons because of their race or national origin.[19]

## VI. EVALUATING WHETHER THE CHALLENGED POLICY OR PRACTICE IS NECESSARY TO ACHIEVE A SUBSTANTIAL, LEGITIMATE, NONDISCRIMINATORY INTEREST

37. Defendants cannot claim that the have a substantial legitimate nondiscriminatory interest in avoiding discrimination given the fact that the Madison point Apartments are located on the outskirts of the Afro-American community anyway.

38. Moreover, the Madison Point Apartments are located on the namesake the Fair Housing Act was premised on Dr. Martin Luther King.

39. Congress enacted the Fair Housing Act in response and in wake of the assassination of Dr. Martin Luther King.

40. Dr. King was arrested and convicted himself 53 times (and not all for protests) so the questions become would he too be denied housing at Madison Point?

---

[19] 24 C.F.R. § 100.500(c)(1); accord Inclusive Cmtys. Project, 135 S. Ct. at 2522-23. A discriminatory effect can also be proven with evidence that the policy or practice creates, increases, reinforces, or perpetuates segregated housing patterns. See 24 C.F.R. § 100.500(a). This guidance addresses only the method for analyzing disparate impact claims, which in HUD's experience are more commonly asserted in this context. This burden is satisfied by presenting evidence proving that the challenged practice actually or predictably results in a disparate impact.

## REMIDIES SOUGHT

a. Plaintiff Burton and class seeks compensatory and punitive damages decided by a jury;

b. Plaintiff Burton and class seeks an order appointing counsel to represent him and/or the class;

c. Plaintiff Burton and class seeks an injunction prohibiting Madison Point Apartments from discriminating against Afro-Americans based criminal record

d. Plaintiff Burton and class seek an order requiring the defendants to cease and desist from any retaliations from the filing of this suit.

e. Plaintiff Burton seeks reimbursement of all wages lost.

f. Plaintiffs request any and all just entitlements the court deems necessary.

Respectfully submitted,

*John L. Burton*
John L. Burton
P.O. Box 693
Bay Pines, Florida 33744